May it please the Court. My name is Matthew Henkin from the law firm of Boies, Schiller & Flexner, representing five small Midwestern grocery retailers who are the plaintiff's appellants in this case. This appeal concerns a fundamental error of law in the District Court's special verdict form and jury instructions in a trial for violation of the Sherman Act. Plaintiffs alleged that defendant C&S, the largest grocery wholesaler in the United by agreeing with its largest horizontal competitor, SuperValue, to allocate customers and territories. Although it is black-letter law that horizontal competitors that either allocate an entire territory or allocate certain customers in a territory are either sufficient to violate the Sherman Act, the District Court erred in requiring the jury to find both customer and territorial allocation in order to find any violation. The District Court compounded its error by failing to instruct the jury at all in customer allocation. Plaintiffs were thus denied their substantial right to a jury verdict on each of the per se violations of the Sherman Act that they alleged and for which they proffered evidence at trial. Do you think that you made it clear to the District Court what your specific customer allocation argument was? Because the District Court was pretty clear that it thought that the theory was basic. She called it a hybrid. So it was a combination of territory and customer. Maybe you can point me to it in the record, but I didn't see where you actually said to her, no, there's territory, which is the Midwest, but then within that territory there is a type of customer distinction. My understanding was the big retailers versus the independent. Is there some place in the record where you actually articulated that to her? Thank you, Your Honor. I just wanted to address first this notion of the hybrid. That is language that comes from the pretrial conference, which is cited by CNS. There we're talking about the question of whether or not the customer allocation is one where you're allocating an entire customer or just sort of product lines that are provided by those customers or that you provide to those customers as a wholesaler. If you look at the submission, though, that CNS makes, if you look just a few pages earlier at their appendix at page 13, we have the court asks, but is this a customer allocation case, do you think, or territorial? And Mr. Bruckner responds, well, we think it is both, Your Honor. I mean, we think that it is allocated customers in those geographic markets, but we also think it was a territory-wide or geographic area-wide agreement. So that's at their appendix at page 13. And the court says, again, just two pages before that, and you're willing, as I understand it, all the pleadings at this point to rise or fall upon a jury answering a question. Was there a secret agreement between SuperValue and CNS to divide up customers and or territories, or what we work onto that would be a per se violation if proved? And Mr. Bruckner said exactly right, Your Honor. We think the jury should be told exactly what you just said. So our view is that we made the independence of these claims quite clear from the pretrial conference and, indeed, was clear even in our second amended complaint where we said that it's a class action complaint, we were talking about the common questions of law. And the common questions of law included A, one question was, did CNS agree to allocate territories or did it agree to allocate customers? And maybe the focus of my question is the distinction in the customers, because there could be a case where that is completely collapsed, that you're just talking about customers within a territory. And I'm just searching for sort of that explanation for her as to why this isn't a collapsed territory slash customer. And you've answered, I think, so. Okay. I guess the one other thing is that some of the evidence comes out at a matter, came out at trial, that came out of the testimony as well. For instance, from Ms. Howder, who made it clear that all of the customers that SuperValue, that CNS said that it considered doing business with in the Midwest, were all major retailers except for the ones that they did not contact after they reached agreement with SuperValue. So that, I think, is one of the reasons that prior to that, it was difficult for us to make the, that was sort of a, the particulars of the customer allocation theory sort of developed over the course of the evidence at trial in part. So the first question is, is did we- Wait, say that again. It was difficult for you to make the argument earlier because why? Because the evidence at trial, in part, the evidence came out at trial that made it clear that all of the, all of the customers that SuperValue, that CNS had contacted or even considered contacting in the Midwest were major retailers. They were what CNS identified as major retailers. That is, they were large chains, not the small independents that SuperValue, that were allocated to SuperValue under our, under our theory of the case. Well, your theory of the case was they'd allocated all the customers in the Midwest. That was your theory all along, as I understood it. Your Honor, with respect, our theory was that it is hard to tell when they made an agreement with, what we saw was that they reached the AEA, which we are not challenging, the asset exchange agreement, which Your Honor may remember from prior appeals. Our theory of the case, though, is not that, is not that they allocated thereby the whole territory and all the customers. Our theory of the case is that what we saw was that all of a sudden, upon reaching this very limited agreement, the asset exchange agreement, the behavior of CNS and SuperValue utterly changed with respect to customers that were not even contemplated in that written agreement. And that suggested to us, and further evidence suggested as well, quite strongly, that there was, in fact, a secret agreement. And the question was, what was the nature of that secret agreement that they, that they reached that went beyond the written terms of the AEA? And the answer, I believe, is that, is that a jury could have reached either the conclusion that their behavior evidenced a secret agreement that said we won't compete at all in the Midwest, or it could also be that we'll only compete for certain customers. For example, there's no question but that, that CNS continued to serve a handful of multi-regional customers in the Midwest after its agreement with SuperValue. So it's not the case that they, that we ever took the position that, well, no, you immediately stopped dealing with A&P and stopped dealing with TOPS. Our distinction, though, was that, well, these were special category, namely folks that were part of a multi-regional or national deal that you were then, that sort of had you stick a toe, CNS stick a toe into the Midwest, but not something that, that would prevent them from having allocated many customers, or nearly all customers, or the independent customers. So the, the, what ended up happening, because there are, in fact, these two different, they're these two different claims, two distinct claims of customer allocation, which is an allocation of certain customers, and territorial allocation, which is an allocation of a territory entirely. It was contrary to law for the district court to, over plaintiff's objections, have a special verdict form that permitted the jury to return a plaintiff's verdict only if it found that CNS agreed to divide territories and customers. Would there be a, would there be a trial where the evidence came out such that those two were, in fact, collapsed? It was there, the jury could not find territory without customer, or customer without territory? Thank you, Your Honor. Yes, the answer to that question is yes, and that's a case like US v. Copper's Company, which is cited in both defendants in our briefing. That was a case in which two TAR, two, two participants in TAR, re-TAR-ing roads, agreed that they were going to be, they rigged bids so that one side was going to take, oh, we're going to be the high bidder, or the low bidder, in the eastern portion of Connecticut, and the other one was going to be the low bidder in the western part of Connecticut. And that was found, and that was found to be both a customer and a territorial allocation along with the bid rigging. And in fact, in that case, the court found that they, there could be, that those were inextricably intertwined. There was no way to allocate these towns by bid rigging that wasn't both customer and territorial allocation, which makes sense. But in this case, of course, there are two very, there are two very different claims here. One is that you agreed to get out of the Midwest entirely, which to be perfectly honest, I think that the, I think at least, that the evidence in this case supports. But there's another claim, which is that super, CNS wasn't allocating the entire Midwest to super value, but instead was agreeing to allocate the, all the smaller customers to, to super value, or all of the retail customers. Because in fact, not only did super, did CNS not sell to any independent, new independent customers in the Midwest, CNS didn't sell to any customers in the Midwest. And, but, but they did have some evidence that they had at least considered doing so. And so the question, the question about whether or not the, whether or not the, that constituted a total territorial allocation or total customer allocation or customer allocation that merely allocated the independence was one that the jury should have had the right to determine. However, under the, the verdict form and the instructions that were given, the jury had no way to make those determinations. They were misled, unfortunately, by the, by the instructions that they received from the court. Well, if the, if the court instructed on the basis of the evidence that was submitted, which seemed to me that was the case, the district court got it right. And you're, what's. You, you are certainly right, your honor, that if we, so we objected, of course, to both of these and preserved our objections with respect to the special verdict form and the jury instructions. What, what's the, what's the basis of your objections? Because since we have been making from the beginning, so, so for example, the evidence that we had was, let me give you, let me give you an example. There was evidence that we had that the, that from the Maple Heights, CNS's Maple Heights, Ohio distribution center, before, before CNS agreed with super value, it tried to make, it made what the jury heard was a major push to get independent business. Now the AEA didn't affect that distribution center at all. So the written agreement in this case didn't involve, didn't involve that at all. So years after that written agreement, super value, CNS continued to have this Maple Heights, Ohio facility. But what the evidence of the jury also heard was that CNS never sold to any independent customers out of that distribution center. And indeed there was no evidence at all of any kind of push, much less a major push, once they had agreed with super value. Now that was all evidence that came out at trial and we advanced to the court. Well, we have two different claims here. One is a, one is a territorial allocation claim and the other is customer allocation, but the court made the decision, look, you've, you've said this all along as customer and territorial allocation, territorial and customer. And that, that means that that's how it should be presented to the jury. The flaw in that reasoning, of course, is that when an indictment comes out and you have an, and you indict someone for robbery and murder, you don't have to prove both robbery and murder in order to get a guilty verdict. The point there is that either one of them is sufficient for a guilty verdict and to collect, to connect them together and say, you have to prove both. That's an error of law that this court can fix. So I would like to reserve the rest of my time. If there are no further questions for rebuttal. Very well. You may. Thank you. Thank you. All right, Mr. Silbert, we'll hear from you. Thank you, your honor. Good morning and may it please the court. I'm Greg Silbert from Weill for CNS. So let me start with the hybrid nature of the plaintiff's theory. In this case, the plaintiffs tried a hybrid theory in the following sense. Their theory involved the allocation of both customers and territories together at the same time so that if there was an allocation, it was an allocation of customers within certain territories, both a customer allocation and a territorial allocation, or there was no allocation at all. And that is true of the all-out allocation that the plaintiffs pled in their complaint and tried to the jury. It's also true of the independence only theory that the plaintiffs raised for the first time to the jury in their closing argument. Let me start with the all-out allocation theory, which is the one that they actually tried. Here is that theory in the plaintiff's own words on the first day of trial in their opening statement to the jury. So this is what the plaintiffs told the jury that the evidence would show to prove the plaintiff's claim. They said, and I'm quoting, CNS and SuperValue had this deal to divide up it in terms of the AEA. Basically, they agreed that they wouldn't compete for any Midwest or New England customers CNS agreed to stay out of the Midwest. That's what the plaintiff said to the jury the evidence would show. Now, there seems to be no dispute that that allocation, an allocation of the customers in the Midwest, is an allocation of both customers and territories. That is the same theory that the plaintiffs pled in their complaint. You can look at, for example, paragraph 38. That's the theory that was in the class notice. That's the theory you see in their expert reports. That is the theory that the plaintiffs litigated, including to the jury. Now, plaintiffs themselves described that theory throughout their complaint in their opening statement to the jury as an allocation of customers and territories. And I did not hear, could be wrong, but I did not hear Mr. Henkin argue to you today that based on that theory, which again is the one they pled and tried, that it was somehow incorrect to express the theory in the same terms that plaintiffs themselves did. That is an allocation of customers and territories. And to be clear, it is not like Mr. Henkin's murder and robbery example, because it's possible to commit murder without committing robbery or vice versa. The difference here is that if there was any allocation of customers, it was also an allocation of territories. If there was an allocation of territories, it was an allocation of the customers within those territories. So it's one. What about the evidence that he's described, the opposing counsels described as coming out during the trial, that there was, there were certain, at least the evidence could suggest that there were certain customers within the territories that were off limits and others that were not. Would that be a customer allocation? No, it would still be a hybrid allocation. Let, let me make clear first, Your Honor, that that was not the evidence. In fact, what Miss, Miss Howder testified to was there were serious efforts to acquire, for example, Roundy's, which was a wholesaler that competed with SuperValue and Roundy's served both chains and independent stores. And we made a specific price, a specific monetary offer to acquire Roundy's wholesale business. We talked to investment banks. We didn't ultimately get it. If we had gotten it, we would have served both chains and independent. So there was plenty of evidence that we were competing for chains and independence in the Midwest during the period they say we weren't. But let's say they say, yeah, sure. When you say chains, are you talking about the same category of retailers that he is when he's talking about the big? Yeah, chains are the bigger. Yes, exactly. So, so we were in fact competing for both, but the plaintiffs are now say, well, the independence, the independence only theory that they first presented to the jury in their closing argument, that was just a customer theory, not a territorial theory. That's what they're telling you here now. That's not correct. And it's not what they said to the jury at the time. So during, during their closing argument, right, when, when the plaintiffs were closing to the jury and they presented this independence only theory for the first time, the first time the jury ever heard of it, this is what the plaintiffs said. They said, well, you know, we think that the agreement is broader, that it covered everybody. But then they said, if you disagree, if you find that CNS, well, maybe they competed for some chains, but they didn't compete for independent retailers, then you should answer yes to question one, because under the instruction, there's no requirement that there be an allocation of all Midwest customers. That, that was their theory to the jury. They said at the time of their closing argument, question number one and jury instruction number 20, the same question and instruction that are before you now allowed their independence only theory. And it allowed it because that, that independence only theory, again, involves both a customer and a territorial allocation. It's not as if the plaintiff said, look, you know, forget it. I think the problem he's suggesting is that it doesn't divide the territory. It just divides certain customers in the territory. Well, if, if that were true, Judge Carlton, they would have a big problem, right? Because look at the proposed jury question that they asked the court to give on customer allocation. And you'll find it at page 35 of the plaintiff's appendix. It does not say, did CNS and SuperValue divide up independent customers versus chain customers? What it says is, and again, I'm quoting, did the plaintiffs prove that CNS agreed with SuperValue to divide up customers along geographic lines? There, there's no mention in that question of independence. What they said is, did you divide up customers by territory, by geography? So under, under any interpretation, they wanted to ask a question about that combined customer and territorial allocation. They wanted to ask the question twice. So they first, what they thought the district court should have done is first ask the jury, did the plaintiffs prove that CNS agreed with SuperValue to divide up customers along geographic lines? And then ask a separate question, did the plaintiffs prove that CNS agreed that it would not compete with SuperValue in certain territories or geographic areas? Now, frankly, either one of those questions, both of them are broad enough to include their independence-only theory, right? The first one says, did you divide up customers along geographic lines? Well, it was the, it was the independents in the Midwest. Nobody is saying that there was some secret agreement to divide up independent grocers wherever they may be throughout the country. It was a territorial allocation of some customers, not competing for some customers. And the second question was, you know, did, did plaintiffs prove that CNS agreed that it would not compete with SuperValue in certain territories or geographic areas? Nothing in that question says that there has to be a, an allocation of every single customer or of the entire territory. In fact, that is an issue that we expressly argued to the district court and that was gone. And that's the question that goes to their independence-only theory. We said, and we still think the correct answer should have been, that the, the question to the jury should say, did the plaintiffs prove that there wasn't all that allocation, that we did not agree to, we agreed not to compete for any customers at all? Because that's what the plaintiffs said in their opening statement to the jury. That's what they said in their complaint. They never, they never, as, as Mr. Henkin said, this independence-only theory, it's sort of a, the light bulb went on in their head during the trial as the evidence came in. Right? This was a, this was an 11th hour theory that we were not, that we, we did not litigate against them because they didn't try it. So had they done that, had they pled an independence theory, had they put one in their expert report, had they opened with it, you know, it would have been a different case. We would have doubted their expert. We would have moved for summary judgment on it. We would have cross-examined them differently. We would have, might have put in different expert evidence ourselves. But this was not their theory. So why does their proposed question require a finding that the companies divided up territories? Why does, why does the proposed, why does the proposed customer question? Yeah. Yeah. Because the, yeah. Divide up customers along geographic lines. Yeah. It's the along geographic lines part. In other words, the district asked them, when you say geographic, it's the same thing as territories. And they said, right, that's in footnote 19 of our brief, right? So, so when they say divide up customers along geographic lines, that means divide up customers by territory. It is both a territory. Well, I suppose they would say that could mean only certain customers. Whereas dividing the territory implies the whole territory. Well, it doesn't though. It doesn't. Why not? What does it mean? Well, Your Honor, let's say that the plaintiffs were able to prove a secret agreement. There wasn't one. But let's say they could prove a secret agreement that's, that where we said, you know what? In the Midwest, we'll do nine, we'll, we'll cut out 90% of the competition. We'll only compete 10% as much as we used to. So not a complete division of the territory, but 90% of it. They would still be here telling you that that is a per se violation. Just as if we said, you know what? We'll take a, you know, a few of the customers, but 90% of the customers will lay off. There's no requirement that an allocation of territories be complete, while an allocation of customers can be something less than the total universe of customers. But look, it, it, at the end of the day, plaintiff's theory was that there was an allocation of customers within a territory, and that is both a territorial allocation and a customer allocation at the same time. And if, if the jury had somehow been confused about that, remember that the independence only theory the jury heard about during the closing argument, the first time it was introduced to the jury, it was through plaintiff's counsel telling the jury, you can answer yes to question one if you think there was an independence only theory, because the instruction allows that. Right after that, Judge Montgomery instructed the jury and said nothing different, didn't, didn't disagree or contradict the plaintiff's counsel in any way with respect to this independence only theory. The jury then went to deliberate with plaintiff's counsel's arguments about independence only ringing in their ears. If they had some question about whether plaintiff's counsel had somehow misrepresented what the instruction or the, the jury question allowed them to do, they easily could have asked the judge. And in fact, the, the, in, in, in instruction, I believe 32, the judge says, if you want to communicate with the court, you can do that. Here's how you do it. You write a note. Um, they didn't write a note. They didn't come back. He could have said, well, his argument doesn't fit the instruction, so we're going to rule against him. Well, he, they, they could have, Your Honor, but I don't, I don't think there's any reason to think that they did because his argument, as he said, did fit the instruction. Again, What's he supposed to argue? I mean, he has the instructions. He's got to try to, try to argue that it comes within them, even if it's wrong. Fair enough, Judge. I think if, if, if their independence-only theory fit their own instruction and charge, which again was, you know, was there, it didn't ask, was there a division as between independents and chains or large grocers? It asked, was there a division of customers along geographic lines? That is, again, a hybrid theory, right? It's a theory that involves a division of customers and territories. And if they think that their independence-only question or theory fit that question, the one that they wanted to ask, then it fit the, it fit question number one, at least as well. And same with the instruction. But let me just take one second to orient ourselves here because we've been talking a lot about this independence-only question. You don't even get there unless you think that the district court abused its discretion in the way that it presented the question and jury instruction, right? The first question is, did the district court abuse its discretion? And we think the answer to that is, is no, because the district court presented the jury charge and question in exactly the same terms that the plaintiffs presented it, including in their opening statement to the jury. So we think there's no abuse of discretion there, if that's true. But there is a set, there are, these are two separate concepts, right? Territorial allocation and customer allocation. They are separate in general, but they can converge, as you said, Judge Cawley, and in this case, the plaintiffs alleged and tried a hybrid theory that involved both territorial and customer allocation. So they are separate in principle, but they were not separate in this case. In this case, there was one alleged antitrust violation that involved an allocation of both customers and territories. And so if the, and that's the way the plaintiffs themselves presented it. So if the district court did not abuse its broad discretion when it presented that question to the jury in the same way, then you don't reach their prejudice argument. This whole business about independence only is their attempt to show prejudice or an effect on substantial rights. If you think that the district court did abuse its discretion, then you would get to that prejudice argument. And if you do, there's no prejudice because number one, plaintiffs were allowed to present that theory to the jury. And number two, as we've said in our brief, they shouldn't have been because there was never a showing of antitrust injury with respect to an independence only allocation. Dr. Leisinger did not say anywhere in his testimony, gee, you know, let's assume that CNS was in the Midwest competing for the, let's, 50% of the business at the Green Bay Distribution Center that was chain business, but not competing for the roughly other half of the business that was independent business. How would the competition for the chains have affected pricing such that there would have been antitrust injury for every member of the class? The class included both chains and independents. He never made that argument. So that what actually happened is the plaintiffs were allowed to present their theory, but they shouldn't have been. Very well. Thank you for your argument. Thank you. Mr. Hankin, we'll hear from you in rebuttal. Let me try to go through these things quickly, but comprehensively and understandably. Let's talk about the abuse of discretion standard. Where there has been an error of law, as in this case, that standard is satisfied. The court need not investigate any further once we have determined that there is, as in this case, an actual clear error of law. Now, I want to address most of the arguments that Mr. Silbert mentioned relies on the fact that the argument about independents only being new in the closing arguments simply isn't true. And in fact, what we can do is we can point to the opening statements by defendants counsel at trial, referring specifically to what it is that plaintiffs counsel said. In the appellee's appendix. That's an odd way to show that you raised it earlier. It is, but this is a paragraph you'll see that shows that this, in fact, was a live issue joined before the jury. Now, of course, opening statements are not evidence, but they are evidence about what's raised at trial. I think you'll find this quote illuminating. Quote, well, you heard plaintiffs counsel say that there were all these independent mom and pop stores that we didn't pursue, ignoring all the chain customers that we did pursue. That was the pie chart that Mr. Drew Bell showed you. But the evidence will clearly show why, because CNS's primary business focus was pursuing large chain customers, not one-off mom and pop independent grocery stores. Only if we first had a large anchor chain would we then consider adding independents. The point is, is that we each party was offering an independent, a distinct explanation of why it is that CNS did not pursue independent customers. Plaintiffs were saying it was because of an agreement that went beyond the bounds of the written agreement. Defendants were saying that it was because of a general business strategy. Our point is not that this court should decide that, and I shouldn't decide it, and defendants counsel shouldn't decide it. It was the jury's role to decide that, and the jury was not allowed to decide that because of the errors of law made in the verdict form and made in the jury instructions. Why doesn't instruction number 20 allow you to argue your theory when it talks about not competing for new customers in certain territories or geographic areas? Why wouldn't that fit right with your theory of not competing for new independent grocers in certain territories? Thank you, Your Honor. The problem is that CNS had no customers in the Midwest, none, except the ones that were outside the class area, none, zero. The question of did they compete for new customers is essentially the same thing, did they compete for any customers? Because if CNS doesn't compete for new customers, the claim is they didn't compete for any, and that is stronger than what we are saying. What we're saying is that customer allocation- Why does new customers have to mean all customers? Any and all new customers? So I think that a fair reading of that sentence, and if it had said some new customers or certain new customers or some qualification, but I think a fair reading of that sentence can't be other than to say that new customers, they would not compete for new customers, means they wouldn't compete for new customers. So if I competed for a new customer, which would say I would be competing for a new customer and would be showing that that statement, that I didn't compete for new customers, would be false. Okay. Very well. I had one more point, let me just make this one point if I may, which is just that the point made by CNS's counsel that it is not clear that territorial allocations need to be for an entire territory, but customer allocations can be for just some customers in a territory. I would ask the court to look at what's referred to in our briefing with the ABA model jury instructions, because that is precisely the distinction that is made there, and it's precisely the distinction that's made in the cases. Thank you very much. The distinction is that- The distinction is that territorial allocation is an agreement not to compete in a territory, which is to restrict- A hundred percent? A hundred percent. And a customer allocation, and the ABA model jury says certain customers. All right. Understood. Thank you very much for your argument. Thank you to all counsel.